**AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS, Plaintiff,**

v.

**BLUE CROSS OF FLORIDA, INC., and Blue Shield of Florida, Inc., Defendants.**

**Civ. No. 71-1423.**

United States District Court,
S. D. Florida.

July 27, 1972.

Carey, Dwyer, Austin, Cole & Selwood, Miami, Fla., and Law Firm of Malcolm A. Hoffmann, New York City, for plaintiff.

Kelly, Black, Black & Kenny, Miami, Fla., for defendants.

## MEMORANDUM OPINION AND FINAL JUDGMENT

FAY, District Judge.

Plaintiff American Family Life Assurance Company of Columbus (AFL) is a corporation incorporated under the laws of the State of Georgia and has its principal place of business in Columbus, Georgia. AFL is engaged in interstate commerce by virtue of its insurance transactions across state lines and is licensed to do business in forty-two states, including Florida. Its primary business is the sale of cancer plan insurance policies providing for payment solely in the event of certain expenses incurred in connection with a confirmed diagnosis of cancer, subject to exercise of certain options by its policy holders. Payment is made regardless of what benefits, if any, are paid by other insurance companies on the same risk. Defendant, Blue Cross of Florida, Inc. (Blue Cross) and defendant, Blue Shield of Florida, Inc. (Blue Shield) are both non-profit Florida corporations. Blue Cross operates a hospital service plan and Blue Shield operates a medical or surgical service plan. Both defendants operate these plans throughout the State of Florida under Chapters 624–632 and 641 of the Florida Statutes, F.S.A., and are subject thereunder to supervision and regulation by the Department of Insurance of Florida. The business activities of each defendant extend throughout the United States and constitute a continuous flow of commerce among the several states of the United States.

The complaint consists of two claims. In the first claim plaintiff alleges that defendants adopted and thereafter administered their coordination of benefits provisions in an unlawful conspiracy to boycott between themselves and other companies within the Blue Cross/Blue Shield structure at the national and local levels. The second claim alleges a similar and related conspiracy to boycott between defendants, other Blue Cross/Blue Shield plans and their trade associations, and private health companies and their trade associations. Both alleged conspiracies to boycott allegedly have as their purpose and effect to exclude the plaintiff from vast segments of the market in Florida for its franchise cancer plan policies. The Court has jurisdiction of this subject matter under the Clayton Act (15 U.S.C.A. § 22), the Sherman Act, and 28 U.S.C.A. § 1337. Venue lies in this judicial district by virtue of the special venue provisions of the Clayton Act, 15 U.S.C.A. § 22. Defendants transact business in this judicial district and their activities affect interstate commerce.

The plaintiff originally sought treble damages under Section 4 of the Clayton Act, 15 U.S.C.A. § 15, and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C.A. § 26, but waived its right to a jury trial and abandoned its claim for treble damages except in the nominal amount of $5.00 and seeks an injunction prohibiting defendants from using or applying its coordination of benefits provision against the plaintiff's franchise cancer plan policies. However, the plaintiff claims that by showing injury to its property or business it is qualified for an award of reasonable attorney fees.

At the heart of this controversy is the coordination of benefits provision or COB as it is more commonly known. Adoption of a model COB provision was recommended in December 1962 by four trade associations of private health insurance companies, namely, the Health Insurance Association of America, the Life Insurance Association of America, the American Life Convention and the Health Insurance Council. COB has as its primary characteristic a structure of priority of claim payments which enables broad risk accident and health insurance carriers to reduce the amount of premi-

ums paid out by limiting the claimants to a single payment of benefits for a single medical risk. If two or more policies would result in payment of more than 100% of the expenses, then coordination of benefits is applied. If, therefore, as is not infrequently the case in the event of a serious injury or illness, two or more policies, with or without coordination of benefits, provide together total benefits less than the expenses, coordination is not applied. For example, if as a result of a serious illness, hospital and medical expenses of $10,000 are incurred, and under two group policies a total of $7,500 is available, coordination of benefits would not apply at all. If hospital and medical expenses of $1,000 are incurred and $800 is available under one policy and $800 under another, and if either one or both of the policies have a coordination of benefits clause, then rather than paying $1,600, the total benefits under both policies would be limited to $1,000 by application of the coordination of benefits clause or clauses. When both policies have a coordination of benefits clause, then an order of benefits rule—the primary carrier rule—is applied. Under these rules, for example, the husband's carrier is considered primary and the wife's carrier secondary so that in the example, the husband's carrier would pay $800 and the wife's carrier would pay only $200 to bring the total up to 100%. When only one of the policies has a coordination of benefits clause, then the carrier without a coordination of benefits clause, such as the plaintiff, would always be deemed primary. This is known as the automatic primary rule or the dumping clause The carrier without a coordination of benefits clause pays no more in that event that it has obligated itself to pay by its policy contract and the operation of the automatic primary rule or dumping clause cannot cause such a company to pay more than it would pay whether or not the other company had a coordination of benefits clause.

On December 1, 1963, the Blue Cross and Blue Shield plans in the Southeastern United States began to administer a group contract with Southern Bell. The Southern Bell contract, awarded through competitive bidding on specifications prepared by Southern Bell, contained coordination of benefits provisions and in accordance with that contract the defendants applied certain order-of-benefits rules. Beginning on August 24, 1964, and after much discussion and exchange of information between themselves, the Blue Cross Association, local Blue Cross and Blue Shield plans operative outside Florida and with private health insurance companies, defendants began to generally apply the same order-of-benefit rules in determining the amounts payable under most of their group contracts containing coordination of benefits provisions although their riders did not themselves contain those order-of-benefit rules. Subsequently, with the approval of the Insurance Commissioner of Florida, the defendants began to make available and write group hospital and group medical or surgical service plans with an anti-duplication or coordination of benefits provision noted in the margin.[1] Also defendants have made available and have written since August of 1964, group hospital and group medical or surgical service plan contracts without coordination of benefits provisions, and a substantial number of subscribers are now covered by such group contracts.

1. " 'Exclusions' is hereby amended by adding thereto a further exclusion of services, as paragraph (i), for which no benefits would be provided:
"Services of supplies furnished to a subscribe or paid under any of the following plans or insurance coverages; (1) any plan, program or insurance policy provided through a group arrangement including, but not limited to, any to which an employer contributes or makes payroll deductions; (2) any contract issued by this Plan or any other Blue Cross or Blue Shield Plan; or (3) any coverage under a plan or law of any federal, state or other government or any political subdivision thereof."

The initiation by the defendants of the use of COB provisions was done without any intent to harm the plaintiff's business, but rather it was put into use so that the defendants could remain competitive in the field of broad risk group health and accident insurance. The record discloses that defendants and other Blue Cross/Blue Shield plans adopted COB provisions in order to avoid always paying first under the "dumping clause" of the model COB provision which was adopted on a widespread basis by the private insurance industry beginning in 1963 and 1964. This "dumping clause" is precisely that portion of the COB clause about which plaintiff complains. The plaintiff feels the alleged boycott is concretely illustrated by the action of the defendants on Miami Beach. Since January 1967, the defendants have provided group health and accident insurance coverage for the employees of the City of Miami Beach and the contract with the city includes a provision for coordination of benefits. The bid specification of the City of Miami Beach required a provision for coordination of benefits "of any other group insurance policy". Although there is a serious question as to whether the plaintiff sells group insurance as that term is used in the defendants' insurance contract with the Miami Beach City employees, they elected to apply it to the plaintiff's cancer policy because it was sold through a franchise group (payroll payment) plan. The practical effect of this is that the defendants obtain "free" reinsurance at the expense of their insured's employees. Since the employees paid two premiums to receive only one benefit which they would have received anyway for the payment of one premium under the defendants' policy, individuals who have purchased AFL cancer policies through a franchise group plan will in most instances either cancel their policies or allow them to lapse upon learning of this situation. This is precisely what occurred on Miami Beach when 58 of the 119 policy holders covered by the defendants' group

policy with the city either cancelled or allowed their AFL cancer policies to lapse. A single-risk policy such as the AFL Cancer Plan covers only one risk of disease in the vast market of policies covering medical risks, and the number of times the Blue Cross/Blue Shield COB provision is applied against plaintiff's policy is necessarily miniscule as compared with the payments made under the broad-risk policies. This is true since a concurrence of three factors must occur before such an application of COB is made by the defendants. The insured must be covered by the plaintiff's policy and that of the defendants, and the insured must have purchased his cancer risk policy from the plaintiff through a franchise group (payroll payment) plan. However, it is this application which the plaintiff deems to constitute a boycott in restraint of trade within the terms of Section 1 of the Sherman Act.

The defendants have from the very beginning of this lawsuit contested this interpretation of Section 1 and took the position that without competition between plaintiff and the defendants there can be no violation of Section 1 because there is no restriction or abridgement of competition in the market. The defendants jointly engage in competition with commercial insurance companies engaged in the general (broad risk hospital and medical expense) health and accident insurance business. However, as AFL's President, John B. Amos, testified at trial, his company does not engage in competition with the defendants in the general health and accident insurance business in Florida. Plaintiff does not sell cancer policies in Florida in competition with the defendants, nor does the plaintiff market or attempt to sell or write cancer policies in Florida as a substitute for insurance coverage sold in Florida by the defendants. Also the defendants have never written or offered for sale riders to their service plans covering the single risk of cancer, nor have they sought or applied for authorization of the Insurance Commissioner of Florida to do so. The defend-

ants buttressed their argument with an exhaustive list of cases illustrative of violations of Section 1 in which there was competition between plaintiff and defendants, but neglected to put forth Apex Hoisery Company v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, which the Court feels incisively supports their contention. See also Prepmore Apparel, Inc. v. Amalgamated Clothing Workers of America, 431 F.2d 1004 (CA5, 1970).

Factually, *Apex* is dissimilar with the present case, however, the Supreme Court in trying to decide the applicability of the broad literal terms of Section 1 to a violent strike and take over by union members which had shut down the entire production of a hosiery mill and blocked substantial hosiery shipments from interstate commerce, were also faced with the essential question of whether competition was necessary to a restraint of trade violation within the act. Obviously, the labor union's actions fell within the literal terms of "restraint of trade" since the union had stopped production and shipment of products destined to be sold in interstate trade. However, after a thorough examination of the Congressional history and prior judicial construction of that imprecise phrase, the Court found the union's reprehensible actions were not cognizable by Section 1 of the Sherman Act because their actions were not aimed at controlling or restricting competition in the market place. The Court said that it had "never applied the Sherman Act in any case whether or not involving labor organizations or activities unless the Court was of opinion that there was some form of restraint upon commercial competition in the marketing of goods or services . . . ." The "rule of reason" which is the cornerstone of modern antitrust law was found to be based upon the common law meanings of illegal restraint of trade. The Court stated,

"   .   .   .   in thus grounding the "rule of reason" upon the analogy of the common law doctrines applicable to illegal restraints of trade, the Court gave a content and meaning to the statute in harmony with its history and plainly indicated by its legislative purpose. Labor cases apart, which will presently be discussed, this Court has not departed from the conception of the Sherman Act as affording a remedy, public and private, for the public wrongs which flow from restraints of trade in the common law sense of restriction or suppression of commercial competition. In the cases considered by this Court since the Standard Oil Co. case in 1911 some form of restraint of commercial competition has been the sine qua non to the condemnation of contracts, combinations or conspiracies under the Sherman Act. . . . "

Since this interpretation makes restriction of competition a necessary element of an illegal restraint of trade, the plaintiff is without a remedy under Section 1 of the Sherman Act. The effect on the plaintiff's business, which is noncompetitive in Florida with that of the defendants', is only a side effect of a move made by the defendants to enable them to remain competitive in their own market. As the evidence of its recent remarkable growth in spite of the general use of coordination of benefits goes far to support, the plaintiff is not driven out of his market in cancer risk insurance. He is simply precluded from the marketing method of selling his cancer policies by the franchise (payroll payment) plan when the prospective buyers are already covered by a broad risk carrier using coordination of benefits in its coverage. However, the plaintiff still has access to that particular class of prospective buyers since coordination of benefits are not applied against his policies by broad risk carriers covering the same risk when those policies were sold by a method other than through the franchise group plan. Therefore, the Court holds that the defendants' application of their co-

ordination of benefits provisions to the cancer risk policies sold by the plaintiff on a franchise (payroll) group basis does not violate Section 1 of the Sherman Act. This ruling is limited to the plaintiff's antitrust claim before this Court and is not intended to a ruling on any other claim for relief, if any, the plaintiff may have against these defendants.