182 N.J. Super. 342 (1981)
440 A.2d 1353
ALICE STARKS, AN INDIVIDUAL; JULIUS KAY, AN INDIVIDUAL; BARBARA ROCAFUERTE, AN INDIVIDUAL; UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, LOCAL 464, AFL-CIO, AMALGAMATED WELFARE FUND, A TRUST; AND ALL PRESENT AND FUTURE MEMBERS OF THE CLASS, PLAINTIFFS-APPELLANTS,
v.
HOSPITAL SERVICE PLAN OF N.J., INC., A NEW JERSEY CORPORATION; AND MEDICAL-SURGICAL PLAN OF N.J., INC., A NEW JERSEY CORPORATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 20, 1981.
Decided December 23, 1981.
*343 Before Judges MATTHEWS, PRESSLER and PETRELLA.
Harold Krieger argued the cause for appellants (Krieger & Chodash, attorneys; Harold Krieger and Paul T. von Nessi on the brief).
Richard L. Plotkin argued the cause for respondents (Pitney, Hardin & Kipp, attorneys; Richard L. Plotkin and Raymond T. Roche on the brief).
The opinion of the court was delivered by PRESSLER, J.A.D.
This appeal presents a novel "other insurance" type of problem which raises important questions relating to the interpretation of the coordination of benefits provision of Blue Cross and Blue Shield group contracts. These questions arise in the context of an action brought by union members and their welfare *344 fund seeking to have the union's medical expense reimbursement plan declared exempt from the operation of the Blue Cross/Blue Shield coordination of benefits provision.
Analysis of the issues here involved requires some brief background exposition. The Hospital Service Plan of New Jersey (Blue Cross) and the Medical-Surgical Plan of New Jersey (Blue Shield) are nonprofit corporations organized pursuant to N.J.S.A. 17:48-1 et seq. and 17:48A-1 et seq., and providing broadspectrum hospital and medical service benefits. N.J.S.A. 17:48-6.1. See, generally, as to the nature and functioning of Blue Cross and Blue Shield, N.J. Insurance Agents v. Hospital Service Plan N.J., 68 N.J. 213 (1975).
One of the mechanisms by which benefits are provided is the issuance of employer group contracts which afford the employee-subscribers the opportunity to obtain benefit coverage not only for themselves but for their eligible dependents, including spouses as well. Blue Cross and Blue Shield are not, of course, the only authorized providers of both individual and group health and accident benefit coverage, and as more coverage is made available to more people by the proliferation of both private and governmental service and indemnification plans, the possibility of duplicate coverage for the same risk increases. The duplicate coverage potential is obviously also enhanced by the growing phenomenon of wage-earning by both spouses. Thus, it is a common occurrence for each spouse to be covered as a direct beneficiary or subscriber of his own employer's group contract and as a dependent beneficiary of his spouse's employer's group contract as well. The children of such a couple are also doubly covered as dependents of each of their parents.
In order to avoid duplicate recovery by beneficiaries who are covered for the same benefits by multiple plans and to address with particularity the duplicate coverage potential otherwise resultant from multiple interfamily plans, the health insurance industry has developed in the last several decades a double-recovery prevention technique called the coordination of benefits provision (COB). As explained by one court,

*345 COB has as its primary characteristic a structure of priority of claim payments which enables broad risk accident and health insurance carriers to reduce the amount of premiums paid out by limiting the claimants to a single payment of benefits for a single medical risk. If two or more policies would result in payment of more than 100% of the expenses, then coordination of benefits is applied. [American Fam. Life Assur. Co., Columbus v. Blue Cross, Fla., 346 F. Supp. 267, 268-269 (S.D.Fla. 1972), aff'd 486 F.2d 225 (5 Cir.1973), cert. den. 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974)]
COB is not, of course, the only industry approach to the duplicate-coverage problem. Contracts covering all types of risks customarily contain some provision specifying or modifying the carrier's responsibility to its insured in the event that the risk insured against is covered by other insurance as well. These provisions, although presenting a wide range of variation and permutation and raising multitudes of constructional conflicts and problems, fall generally, nevertheless, into one of three broad categories. The first is the one in which the carrier undertakes to remain primarily liable on the risk despite other insurance but ordinarily stipulates that it will bear only a pro rata liability with other primary insurers. The second category is the excess insurance clause where the carrier agrees to pay the loss only to the extent it exceeds the coverage afforded by other available insurance. And the third is the escape clause where the carrier disclaims any liability to pay the loss if the loss is otherwise covered. See generally, 8A Appleman, Insurance Law and Practice, §§ 4906 at 341-352 (1981). The essence of the COB technique is to define those other-coverage circumstances which will render the Plan's payment obligation primary and those which will render it secondary  or, in customary parlance, excess.
The method by which the Blue Cross/Blue Shield COB provision before us seeks to accomplish this accommodation is by first defining the other coverage which will invoke the operation of COB and thereby potentially modify its primary obligation. The COB provision then stipulates that as to such other coverage, which does not also contain a COB provision, the Blue Cross/Blue Shield benefits will be secondary or excess only. Where the other coverage does contain a COB provision and that *346 COB provision, in the circumstances of the claim, renders the other coverage secondary or excess, Blue Cross/Blue Shield will undertake the primary responsibility but only pursuant to its three stated rules for determining the order of benefit payment. The first rule is that where a claimant is covered by one plan as a direct beneficiary and by another plan as a dependent of a direct beneficiary, the plan covering the claimant as a direct beneficiary pays first. The second is, essentially, that as to children, the father's plan pays before the mother's plan. The third is that where neither of the first two rules are applicable, the plan covering the claimant for the longest period of time pays first.[1] Blue Cross/Blue Shield further defines as other programs against which it will coordinate benefits:

*347 ... [P]rogram providing benefits or services for or by reason of hospital, extended care facility or home health agency care or treatment, which benefits or services are provided by:
(a) group, blanket or franchise insurance coverage, group practice, individual practice, Blue Cross or Blue Shield or other prepayment coverage, coverage under labor-management trusteed plans, union welfare plans, employer organization plans, or employee benefit organization plans, including any federal or state or other governmental plan or law, toward the cost of any of the foregoing to which any employer shall have contributed or with respect to which any employer shall have made payroll deduction, or
(b) coverage under any program solely or largely tax-supported or otherwise provided for by or through action of any government. [Emphasis added]
The synthesis of all of these various provisions, insofar as we can determine from the direct stipulations of the COB provision and the reasonable inferences raised thereby, is that the Blue Cross/Blue Shield obligation is intended always to be secondary to the other defined coverage unless that other coverage has a COB provision making it secondary in the circumstances and the terms of one of the three rules requiring Blue Cross/Blue Shield to pay first have been satisfied.
The individual plaintiffs here are all members of United Food and Commercial Workers International Union, Local 464, AFL-CIO (union). The union's Amalgamated Welfare Fund maintains a group reimbursement plan (Welfare Fund Plan) for all members which is available to all persons covered by a collective bargaining agreement between the union and a contributing employer. The essence of the Welfare Fund Plan is to reimburse *348 members and their dependents for hospital and medical services for which they have no other source of payment, in accordance with a stated schedule of benefits. Throughout the plan documents the reimbursement nature of the plan is stressed. Thus, the document states that "This is not an insurance plan and this is not an additional payment plan. It is strictly only a reimbursement plan." The Welfare Fund Plan also includes what is expressly entitled a coordination of benefits provision reading as follows:
If there is any other source of payment this Plan will not reimburse you, but if that outside source pays less than this Plan, the Plan will cover the difference within the limits as provided under the schedule of benefits. Whenever you intend to apply for benefits under this Plan, you must do two things. First, you must disclose every other possible source of payment. Second, you must apply to those sources before applying to this Plan.
For example, your spouse (husband or wife) is an eligible dependent under this Plan and would normally be covered, but if your spouse works and is covered at their job by any sort of benefit plan or insurance, that is what is meant by another source. Also included in any other sources are proceeds of any lawsuit as well as governmental programs.
The controversy here arises from the fact that the individual plaintiffs are all direct beneficiaries of the Welfare Fund Plan and each is also the spouse and hence a dependent of a direct subscriber under a Blue Cross/Blue Shield employer group contract. The question then is whether the Welfare Fund Plan is a program against which Blue Cross/Blue Shield is entitled to coordinate benefits, thereby converting its primary responsibility into a secondary or excess one.
It appears that for some time prior to August 1979 it was the mutual understanding of Blue Cross/Blue Shield and the Welfare Fund that the Welfare Fund Plan did not constitute a program against which Blue Cross/Blue Shield could coordinate. Indeed, the question specifically arose in 1978, and on July 14 of that year, after reviewing the Welfare Fund Plan, the Director of Third Party Recovery of Blue Cross/Blue Shield, Daniel C. Remler, so advised the Welfare Fund's attorney in writing. That letter stated, in pertinent part, as follows:

*349 At the present time, I feel the statement that Local 464 is only a reimbursement program is valid. Since my legal background is minute, I am taking the liberty of forwarding all the principle [sic] information to our law firm to review. If their opinion is any different from mine I will contact you immediately. Per this letter, I am notifying all my examiners to no longer regard Local 464 as a basic insurance program.
Apparently Blue Cross/Blue Shield thereafter continued to pay service benefits as the primary obligor for dependents of its subscribers who were also Welfare Fund members. Over a year later, on August 7, 1979, Remler wrote again to the Welfare Fund's attorney, advising that his original position had been incorrect. He went on to explain that
* * * We have been requested to have our legal firm review your contract as it would compare to any group contract underwritten by New Jersey Blue Cross or Blue Shield which has a COB clause. It has been the determination of our legal counsel that our group COB clause can be applied.
This means that in determining benefit availability, Local 464 would be responsible for any eligible service provided to their contract holder. It has also been determined that if claims have been paid incorrectly under a New Jersey Blue Cross or Blue Shield group contract with a COB clause, we have a right to recover such payments.
In implementation of this reversal of position, Blue Cross/Blue Shield refused to pay benefits to or sought reimbursement of benefits already paid on behalf of the individual plaintiffs. They accordingly commenced this action, joined by the union and the Welfare Fund, seeking a declaration of the responsibility of Blue Cross/Blue Shield to assume the primary obligation for Welfare Fund members who are dependents of Blue Cross/Blue Shield direct subscribers. The trial judge granted summary judgment dismissing the complaint. We reverse.
It was the view of the trial judge that since the Welfare Fund Plan is, literally, a union welfare plan, it is included within the Blue Cross/Blue Shield definition of a program against which it is entitled to coordinate. Since its coordination rules, moreover, relieve it from primary liability vis-a-vis these plaintiffs, the judge concluded that it had acted properly in construing its own responsibility as secondary to the Welfare Fund Plan's in respect of these individual plaintiffs.
*350 We view the matter differently. In our judgment the Welfare Fund Plan only intended to be obligated to make payments to its members for reimbursement of medical and hospital expenses to the extent that the cost of those services was not covered by any other source of payment, including employer group contracts such as those issued by Blue Cross/Blue Shield covering its members as dependents of direct subscribers. Its intention thus was to serve as a payment source of absolutely last resort. The Welfare Fund Plan documents as above quoted and cited are not susceptible of any other interpretation. The question then, as we see it, is whether or not this intention is in such collision either with public policy generally or with the expectations and rights of its beneficiaries or with the intention and expectation of the Blue Cross/Blue Shield contract, either stated or implied, as would preclude a court from effectuating it. For the reasons hereafter stated, we answer this question in the negative.
We start with the premise that the coordination of benefits device in group contracts is perfectly valid and enforceable so long as its operation does not impinge upon a beneficiary's right to and expectation of full coverage but rather is employed only to prevent double recovery and thereby to reduce premiums. See, so holding, Barker v. Coastal States Life Ins. Co., 138 Ga. App. 164, 225 S.E.2d 924 (Ct.App. 1976); Renslow v. Standard Life & Acc. Ins. Co., 517 S.W.2d 1 (Tenn.Sup.Ct. 1974); Elmer v. Washington Nat'l Ins. Co., 308 So.2d 312 (La. Ct. App. 1975), review den. 312 So.2d 340 (Ct.App. 1975); Gibson v. Metropolitan Life Ins. Co., 213 Kan. 764, 518 P.2d 422 (Sup.Ct. 1974); Metropolitan Life Ins. Co. v. Smith, 3 Conn. Cir. Ct. 169, 209 A.2d 693 (Cir.Ct. 1965); Blue Cross of Northeastern New York, Inc. v. Ayotte, 35 App.Div.2d 258, 315 N.Y.S.2d 998 (App.Div. 1970); McKay v. Equitable Life Assur. Soc. of U.S., 421 P.2d 166 (Wyo.Sup.Ct. 1966); Medical-Dental Service, Inc. v. Boroo, 92 Idaho 328, 442 P.2d 738 (Sup.Ct. 1968). And see, generally, Annotation, "Coverage and Exclusions under Hospital or Medical Service (Blue Cross-Blue Shield) Contracts," 81 A.L.R.2d 927 *351 (1962). To this extent the coordination of benefits provision performs the same function as all other-insurance provisions, namely, to permit insurance carriers to "decide among themselves which is to bear the incidence of a single loss, or whether it is to be shared and in what proportion," Cozzi v. Government Employees Ins. Co., 154 N.J. Super. 519, 529 (App.Div. 1977). The problem here involved is thus the typical one which is raised when a single loss is covered by more than one contract, each of the contracts contains some variation of an other-insurance clause, and the obligors cannot agree on their respective obligations to the end that the loss is fully covered. In dealing with such problems the judicial task is first to determine from the contracts themselves what obligations the respective obligors intended to assume and then to determine whether these intentions are compatible not only each with the other but also with the insured's rights and expectations and with the controlling demands of public policy.
In performing this task, the categorizations of primary, excess and escape provisions are preeminently useful, as is the body of rules developed in this jurisdiction and elsewhere for determining both the techniques and the consequences of so categorizing other-insurance clauses. We recognize that these rules have been developed and applied primarily in the context of motor vehicle coverage, both liability and casualty, and that there is virtually no body of such precedent specifically applicable to clauses such as those here involved. See, e.g., Connecticut Gen'l Life Ins. Co. v. Craton, 405 F.2d 41 (5 Cir.1968). We are nevertheless satisfied that general other-insurance principles are fully applicable here since the substance of the problem in this context is indistinguishable from its more usually encountered form in the motor vehicle and allied fields.
In applying these principles here, it is first evident that in the circumstances before us the Blue Cross/Blue Shield coverage is intended to be primary as to its subscribers and excess as to dependents of subscribers who are direct beneficiaries of other delimited plans. Its intention as to these plaintiffs was apparently, *352 therefore, to provide only excess coverage. It is also evident that the Welfare Fund Plan is not intended to be primary in any circumstances. The conclusion of the trial judge, which effectively rendered the Welfare Fund Plan primary for these plaintiffs, may have accorded with the intention of Blue Cross/Blue Shield. It defeated, however, the intention of the Welfare Fund Plan. In our view, it did so arbitrarily and without appropriate recourse to the controlling principles for determining payment responsibility where both contracts apparently disclaim the primary obligation. Its error, as we perceive it, was its assumption that the Welfare Fund Plan automatically constituted a program against which Blue Cross/Blue Shield was entitled to coordinate benefits simply because it offers a form of hospital and medical benefits and is by technical definition a union welfare plan. Our point of divergence is our conviction that these mechanistic criteria alone are not dispositive and that it is rather the precise nature and purpose of the offered benefits, as compared with the precise nature and purpose of those offered by Blue Cross/Blue Shield, which determine whether it constitutes a plan against which Blue Cross/Blue Shield is entitled to coordinate against. We are further persuaded that these considerations preclude such coordination here.
First, the phenomenon of two contracts covering the same loss, but each rejecting primary responsibility because of the existence of the other contract, is one which our courts have heretofore addressed as a matter of fundamental insurance law. Thus, where both coverages are clearly and mutually intended to be excess in a particular factual context, we have rejected the approach of designating one primary and the other excess on what are essentially arbitrary grounds and we have instead opted for the pro rata sharing of the loss by each carrier. As noted by Cosmopolitan Mut. Ins. Co. v. Continental Cas. Co., 28 N.J. 554 (1959),
Where problems of conflicting "other insurance provisions have arisen, many courts appear to have assumed that one, but not both, of such provisions must *353 yield in order to establish one policy as the "primary" insurance upon which the "other insurance" provision of the "secondary" policy might operate. [at 559]
Concluding, however, that the usually proffered bases for such a result have been fundamentally artificial, our Supreme Court adopted the pro rata rule, reasoning that
The excess insurance provisions are mutually repugnant, and as against each other are impossible of accomplishment. Each provision becomes inoperative if there is no other insurance available. Therefore, the general coverage of each policy applies and each company is obligated to share in the cost of the settlement and expenses. [at 562]
If the provisions of the two plans here were mutually repugnant, we would unhesitatingly apply the Cosmopolitan rule and hold that as to these plaintiffs, Blue Cross/Blue Shield and the Welfare Fund Plan would be obliged to share the payment of benefits pro rata. We do not do so, however, because in our view a comparison of the two operative other-insurance clauses makes it clear that they do not support the predicate of mutual repugnancy. That predicate, as we view it, is the existence in each of the clauses of language which establishes precisely the same order of payment for each coverage. If there is, however, in either but not both of the clauses a clearly expressed intention of the undertaking of an obligation prior to or subsequent to the other, that intention will ordinarily be enforced by the courts.
Indeed, such expressed intentions constitute the basis of enforcement of the customary excess or secondary payment clause vis-a-vis primary undertaking where the insured is entitled to a single recovery only. See, e.g., London, etc., Ins. Co. v. Allstate Ins. Co., 72 N.J. Super. 369 (Ch.Div. 1962); Deblon v. Beaton, 103 N.J. Super. 345 (Law Div. 1968); Carolina Cas. Ins. Co. v. Belford Trucking Co., 121 N.J. Super. 583 (App.Div. 1972), certif. den. 63 N.J. 502 (1973); Western World Ins. Co. v. Allstate Ins. Co., 150 N.J. Super. 481 (App.Div. 1977).
Where the two coverages are not, however, primary and secondary but rather secondary and tertiary, there being no primary coverage in the usual sense, the only rational result is to *354 require the secondary coverage to pay first and the tertiary coverage to pay second. The concept of tertiary coverage, that is, coverage which is intended as excess to ordinary excess coverage is, moreover, not a novel one in insurance usage. While such tertiary coverage has been variously denominated in the lexicon of insurance usage, its unique and special characteristic is that it alone, among all other available insurance, covers only against ultimate net loss and it alone assumes "only residual loss coverage in every event." See Prudential Prop. Cas. Ins. Co. v. New Hampshire Ins. Co., 164 N.J. Super. 184, 192 (Law Div. 1978), denominating such a provision as "contingent excess" and holding it effective to achieve its purpose of imposing an obligation to pay only after recourse has been had to ordinary excess insurance. See also, generally, Appleman, op. cit., § 4910 at 457-49. We are persuaded that the Welfare Fund Plan here constitutes just such contingent excess coverage and that this intention could hardly have been more plainly spelled out.
We recognize that there are situations in which a "less than ordinary excess" clause is unenforceable because of its violation of public policy or its interference with the legitimate rights and expectations of beneficiaries. See, e.g., Motor Club of America Ins. Co. v. Phillips, 66 N.J. 277 (1974), refusing on that ground to enforce an excess-escape clause in an uninsured motorist's endorsement. The evil of the clause there was that the excess coverage provided was not only contingent but was also limited in a manner which would have provided the beneficiary with less than a total loss recovery. This is not the case here since the Welfare Fund Plan contingency does not implicate the ultimate amount of benefits to which the beneficiary is entitled but affects only the order of payment as between obligees. There being no other special considerations brought to our attention which would militate against enforcement here of the obligees' self-arranged order of payment, we see no reason not to effectuate the Welfare Fund Plan's contingent undertaking *355 with the ultimate consequence of requiring Blue Cross/Blue Shield to pay first despite its coordination of benefits provision.
The result we are thus led to for these reasons is compelled by other considerations as well. We note that the National Association of Insurance Commissioners has adopted Coordination of Benefit Guidelines recommending priority-payment procedures to be followed by the industry.[2] Guideline 7 thereof provides that
Carriers are urged to use the following claims administration procedures when one contract is "excess" to all other coverage and the other contract (group health) contains the COB provision: A group contract should pay first if it would be primary under the COB order of benefit determination. In those cases in which it would normally be considered secondary, the carrier should make every effort to coordinate in the secondary position with benefits available through such "excess" plans. The carrier should try to secure the necessary information from the "excess" plan. But if such plan is unwilling to provide the carrier with the necessary information, the carrier should assume the primary position because it has no legal authority to do otherwise.
As we interpret this Guideline, the Blue Cross/Blue Shield contracts here would be regarded as primary, their COB provisions notwithstanding, as compared with contracts which are "`excess' to all other coverage." Since the Welfare Fund Plan is obviously excess to all other coverage, the Blue Cross/Blue Shield plans would, under the Guideline, be obliged to pay first. Although the Guideline does not carry the force of law, we are persuaded both as to its good sense and as to its underpinnings in logic and rationality.
In our view this Guideline is not only consistent with applicable other-insurance principles heretofore set forth but it is also compatible with the essential character of the Blue Cross/Blue Shield group contract and its statutory purpose and mandate of providing a basic, primary broad-range and low-cost medical and hospital service plan. See N.J. Insurance Agents v. Hospital Service Plan of N.J., supra, 68 N.J. at 220-221. Clearly, the *356 implication and the predicate of the Guideline is that all such group contracts are primary in the other-insurance sense. If all are primary, then their COB provisions may be regarded as merely substitutionary for and alternative to the typical pro rata provisions governing the manner in which primary carriers customarily contribute to a single total recovery. That is to say, the consequence of COB provisions is that instead of all primary obligors contributing a portion of the payment of each single claim, the risk is shared by the technique of pre-designating, by specific criteria, which, among the primary obligors, pays all of a particular single claim up to its own maximum coverage. COB provisions may, therefore, be viewed as not affecting or modifying and not intending to affect or modify the primary responsibility of a primary plan vis-a-vis those plans which expressly provide excess coverage only but merely as constituting a mechanism for the orderly and ultimate allocation of the primary responsibility as among all primary obligors.
Thus, the result is the same whether, analytically, Blue Cross/Blue Shield is deemed to provide primary benefits and the Welfare Fund Plan is deemed to provide excess benefits or whether Blue Cross/Blue Shield is, in these circumstances, deemed to provide excess benefits and the Welfare Fund Plan deemed to provide contingent excess benefits. In either case the Blue Cross/Blue Shield COB provision is not reasonably construable as having intended that a contingent resource such as that offered by the Welfare Fund Plan would constitute a plan against which its benefits would be coordinated.
Because we reverse the summary judgment below for the reasons herein set forth, we do not address plaintiffs' alternate theories, including federal preemption by way of ERISA, for imposing primary liability on Blue Cross/Blue Shield.
The summary judgment is reversed and we remand for entry of judgment in favor of plaintiffs.
NOTES
[1] The precise language by which these obligation arrangements are effectuated reads as follows:

........
(2) As to any Claim Determination Period with respect to which this Section IV is applicable, the benefits that would be payable under this Contract in the absence of this Section IV for the Covered Services incurred as to such person during such Claim Determination Period shall be reduced to the extent necessary so that the sum of such Covered Services under all other Programs, except as provided in paragraph (4) of this subsection, shall not exceed the total of such Covered Services. Benefits payable under another Program include the benefits that would have been payable had claim been duly made therefor.
(3) If any Program which is involved in paragraph (2) of this subsection does not contain a provision coordinating its benefits with those of this Contract, then, the benefits under such other Program shall be deemed payable before any benefits are determined to be payable under this Contract.
(4) If, (a) another Program which is involved in paragraph (2) of this subsection and which contains a provision coordinating its benefits with those of this Contract would, according to its rules, determine its benefits after the benefits of this Contract have been determined, and (b) the rules set forth in paragraph (5) of this subsection would require this Contract to determine its benefits before such other Program, then the benefits of such other Program will be ignored for the purposes of determining the benefits under this Contract.
(5) For the purposes of paragraph (4) of this subsection, the rules establishing the order of benefit determination are:
(a) The benefits of a Program which covers the person on whose Covered Services claim is based other than as a Dependent shall be determined before the benefits of a Program which covers such person as a Dependent.
(b) The benefits of a Program which covers the person on whose Covered Services claim is based as a Dependent of a male person shall be determined before the benefits of a Program which covers such person as a Dependent of a female person.
(c) When rules (a) and (b) hereinabove do not establish an order of benefits determination, the benefits of a Program which has covered the person on whose Covered Services claim is based for the longer period of time shall be determined before the benefits of a Program which has covered such person for the shorter period of time.
[2] Proceedings of the National Association of Insurance Commissioners, 1971, vol. I at 228.