ARKANSAS POULTRY FEDERATION INSURANCE
TRUST *v.* Larry LAWRENCE and Arkansas Blue Cross
and Blue Shield, a Mutual Insurance Co.

CA 90-161 805 S.W.2d 653

Court of Appeals of Arkansas
Division II
Opinion delivered March 13, 1991.
[Rehearing denied April 17, 1991.]

*Skokos, Coleman, and Rainwater*, by: *Randy Coleman*, for appellant.

*The McMath Law Firm*, by: *Winslow Drummond*, for appellee.

JUDITH ROGERS, Judge. This case involves a dispute between two health insurance carriers. The insured, appellee Larry Lawrence, underwent a heart transplant on March 3, 1986. In 1978, Lawrence began working as a truck driver for Caldwell

Milling Company in Rosebud, an egg production, grading and distribution operation. As a full-time employee, Lawrence was eligible for coverage, and was covered, under a group health insurance plan with appellant Arkansas Poultry Federation Insurance Trust (hereinafter "Trust"). In June of 1979, Lawrence stopped working for Caldwell Milling on a full-time basis, and resumed being an independent producer for the company as he had been before his employment. As a producer, Lawrence remained eligible for health insurance coverage with the Trust under a different plan, but his coverage was never formally converted. Nevertheless, Lawrence continued to pay premiums, and claims were submitted and accepted by the Trust on his behalf. Since his employment with Atlas Carriers in 1984, Lawrence was covered under a group insurance plan for employees with appellee Arkansas Blue Cross and Blue Shield (hereinafter "Blue Cross").

Prior to surgery, Lawrence first contacted the Trust about benefits, but was informed by its acknowledged third-party administrator, Fewell & Associates, Inc., that a heart transplant was considered an experimental procedure, and was thus excluded from coverage under the plan. Blue Cross paid benefits in the amount of $103,727.41, and thereafter filed this lawsuit, joined by Lawrence, seeking contribution from the Trust, based on a coordination of benefits clause contained in the Trust's policy. The case was tried before the trial court sitting as the trier of fact. The trial court ruled in appellees' favor, finding that Lawrence remained covered under the Trust's plan as an employee, that each insurer extended primary coverage for the loss, and that the Trust would share equally in the loss up to the maximum limits of its liability of $50,000. The trial court also assessed a penalty and attorney's fees against the Trust.

The Trust appeals from this decision and raises four issues for reversal. We find merit in one of the issues raised, and affirm in part and reverse in part.

First, the Trust argues that the trial court erred in awarding judgment when Lawrence was not an eligible, covered employee pursuant to its written eligibility and termination provisions. Under the Trust's plan for employees, only full-time employees, those who work thirty hours a week, are eligible for coverage, and

by its terms coverage terminates when this eligibility requirement is no longer met. Thus, the Trust argues that its coverage effectively terminated when Lawrence ceased full-time employment with Caldwell Milling in June of 1979. Appellees do not question this eligibility requirement, but argue that the Trust is estopped from asserting this position based on certain events which followed the cessation of Lawrence's employment.

At trial, Lawrence testified that when he quit working for Caldwell Milling, he had discussions with Reta Caldwell, the company bookkeeper, about continuing his coverage with the Trust. He said that it was his understanding that his coverage would remain in effect. He testified that the premiums for the insurance were deducted from the payments made to him by Caldwell Milling as a producer, and that he continued to submit claims to the Trust. There is documentation in the record reflecting the submission and payment of numerous claims on behalf of Lawrence and his family from 1981 through 1985.

Reta Caldwell testified that in her conversations with Lawrence, he indicated that he wanted to maintain the insurance by switching over to the producer plan without a gap in coverage. She called this a "unique" situation, as she had never done a change-over before. She said that normally, a producer requesting coverage would fill out a form proving insurability, but that she felt that this form would not apply since Lawrence was already insured. She stated that because she was unsure as to how to proceed, she called Fewell & Associates for instruction. She said that in this conversation she advised that Lawrence was no longer an employee, but that he wanted to continue coverage as a producer. Ms. Caldwell testified that the woman she spoke to on the phone told her to "leave it as it is for the time being." She said that she did what she was told, and had Lawrence fill out a form authorizing the company to withhold premiums from his earnings. She further testified that she never heard anything more from Fewell & Associates about the matter.

Robert Alexander, staff counsel with Fewell & Associates, testified that there was no documentation in its files regarding a request to change Lawrence to the producer plan. He acknowledged, however, that Lawrence remained covered as an employee throughout this period of time. He stated that the difference in

coverage between employees and producers was slight, the differences being in maternity coverage, life insurance benefits and premiums.

Laura Lawrence, the administrator and underwriter at Fewell & Associates, testified that she was responsible for handling the Caldwell Milling account in 1979. She said that she recalled no conversations with Ms. Caldwell about changing plans for Lawrence, and that she never would have advised her to leave his coverage as that of an employee. She described a changeover as a "very simple process," involving the filling out of a request form.

The trial court made the following written findings on this issue:

> The only real dispute as to any essential facts is whether or not Ms. Caldwell advised Arkansas Poultry Federation Insurance Trust of Mr. Lawrence's leaving Caldwell's employment and his request to continue his insurance coverage. The Court is of the conviction that the evidence preponderates the accuracy of her testimony on that fact. That testimony is supported by these facts: (1) Mr. Lawrence paid the entire premiums required for the following several years; (2) The claims paid subsequent to that notice are consistent with his family's continuing need for medical insurance coverage; (3) a conversion form was signed by Lawrence at the direction of Ms. Caldwell; (4) Ms. Caldwell had never before experienced those requirements to change coverages from an employee to a producer. All of these factors support the concept that a notice and inquiry was made by Ms. Caldwell of the Federation through Fewell. If inquiry was made, logic dictates that directions were received and some efforts required to conform by these directions. Equally important was the lack of a motive for either Ms. Caldwell or Mr. Lawrence to fail to complete the conversion on the event of his employment termination. The Court has no way to determine whether Ms. Caldwell failed through misunderstanding to complete the instruction she received from Fewell, or Fewell neglected after receiving notice to follow through to completely inform Ms. Caldwell of those

additional stages required to complete the transfer of plans; however, in review of the procedures employed between Caldwell and Fewell, the billing originating with Fewell, the Court would conclude that Fewell neglected to remove Lawrence from one form of coverage and transfer him to the second.

■■ Estoppel *in pais* is the doctrine by which a person may be precluded by his acts or conduct, or by failure to act or speak under circumstances where he should do so, from asserting a right which he otherwise would have had. *Daves* v. *Hartford Accident & Indemnity Co.*, 302 Ark. 242, 788 S.W.2d 733 (1990). The doctrine of estoppel can be applied to bar the defense of noncoverage in insurance cases. *See Time Insurance Co.* v. *Graves*, 21 Ark. App. 273, 734 S.W.2d 213 (1987) (substituted opinion on rehearing). Any agreement, declaration, or course of action on the part of an insurance company which leads a party insured honestly to believe that, by conformity thereto, a forfeiture of his policy will not be incurred, followed by due conformity on his part, will estop, and ought to estop, the company from insisting on a forfeiture, although it might be claimed under the express terms of the contract. *Home Mutual Fire Insurance Co.* v. *Riley*, 252 Ark. 750, 480 S.W.2d 957 (1972).

■ Our standard of review is well-settled. The findings of fact of a trial judge sitting as the finder of fact will not be disturbed on appeal unless, considering the evidence in the light most favorable to the appellee, the findings are clearly erroneous or clearly against the preponderance of the evidence, giving due regard to the opportunity of the trial court to assess the credibility of the witnesses. *Special Insurance Services, Inc.* v. *Adamson*, 20 Ark. App. 8, 722 S.W.2d 875 (1987).

■ Here, the trial court found credible Ms. Caldwell's testimony that she informed Fewell & Associates that Lawrence was no longer an employee, and that a request was made for the conversion of coverage. For seven years, there was reliance on the representation that Lawrence's coverage was continued. Premiums were paid and accepted, and claims were submitted and paid by the Trust. There is further evidence in the record that in connection with this claim in 1986, Fewell & Associates was again informed that Lawrence was not an employee and that he

had not been since 1979. Fewell & Associates advised that coverage would need to be changed to the producer plan, and there were assurances that no medical benefits would be lost. We are also mindful that Lawrence's claim was not initially denied on the ground asserted here, but was denied on the basis of an exclusion in the plan regarding experimental procedures. Under the circumstances of this case, we believe that the Trust is estopped from asserting the defense of noncoverage. Thus, we cannot say that the trial court's finding that Lawrence remained covered as an employee is clearly erroneous.

Next, the Trust argues that Fewell & Associates, the third-party administrator, had no authority to bind it or to extend or modify the terms of the plan. In this respect the Trust contends that there was no direct communication between it and Lawrence, as principals, and that it cannot be bound by the actions and representations of Fewell & Associates. We disagree.

A general agent is one who has authority to transact all business of the company of a particular kind and whose powers are coextensive to the business entrusted to its care. *Security Insurance Corp.* v. *Henley*, 19 Ark. App. 299, 720 S.W.2d 328 (1986). Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing. It is such authority as he appears to have by reason of the actual authority which he has and such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. *See Hunt* v. *Pyramid Life Insurance Co.*, 21 Ark. App. 261, 732 S.W.2d 167 (1987). As stated in Applemen, *Insurance Law and Practice* § 7230 (1981):

> Where an agent is furnished with indicia of authority by the insurer, it may be bound by his acts. Certainly such authority would seem to be present where the agent issues and delivers policies of the company. Where the evidence shows a holding out or apparent authority, the company is bound, if, in fact, he is an agent of the company.

Our law is well-settled that an agent acting within the apparent scope of his authority, even though in violation of actual authority, may bind his principal if the one with whom he deals does not have notice of these restrictions. *Chadwell* v. *Pannell*, 27 Ark.

App. 59, 766 S.W.2d 38 (1989).

■ The record reflects that Fewell & Associates is entirely responsible for administering the Trust's plan. It drafts policies, accepts premiums, and furnishes claims forms, among other things, and the brochure directs all inquiries to it regarding claims and coverage. Although there is a procedure for appeal to the Trust, Fewell & Associates makes decisions concerning the denial and payment of claims. Furthermore, Ms. Caldwell testified that whenever she had questions about claims and procedures, she contacted Fewell & Associates for advice. It has been held that the employer is the employee's agent in connection with a group insurance policy. *Standard of America Life Insurance Co. v. Humphreys*, 257 Ark. 618, 519 S.W.2d 64 (1975).

■ The record as a whole suggests that Fewell & Associates is the general agent of the Trust, and has been clothed with either actual or apparent authority in dealing with matters of the kind involved here. And, the knowledge of an agent of the insurer, obtained while performing the duties of his agency, is imputed to the insurer. *Kansas City Fire & Marine Insurance Co. v. Kellum*, 221 Ark. 487, 254 S.W.2d 50 (1953). It follows that the Trust is bound by the actions, or inactions of Fewell & Associates in this case.

As its third point, the Trust argues that the trial court erred in requiring it to coordinate benefits, and in holding that both it and Blue Cross were primary insurers, sharing equally in the loss. In support of this contention, the Trust has referred us to Guideline 7 of Rule and Regulation 21 as adopted by the Arkansas Insurance Department. This guideline provides:

> *GUIDELINE 7: EXCESS COVERAGES (I.E. SELF-INSURANCE AND OTHER NON-REGULATED GROUP CONTRACTS)*. Carriers shall use the following claims administration procedures when one health contract is "excess" to all other coverage and the other contract (group health) contains the COB provision:
>
> A group contract should pay first if it would be primary under the COB order of benefit determination. In those cases in which it would normally be considered secondary, the carrier should make an effort to coordinate

in the secondary position with benefits available through such "excess" plans. The carrier should try to secure the necessary information from the "excess" plan, but if such plan is unwilling to provide the carrier with the necessary information, the carrier should assume the primary position because it has *no legal authority to do otherwise.*

(Emphasis the Trust's.) In our view, Blue Cross essentially complied with the guideline by the payment of benefits. We are not persuaded, however, that this guideline relieves the Trust of its obligation to provide coverage, which we have held it is estopped to deny, under its own contract of insurance.

The policies of both insurers in the instant case contain coordination of benefits clauses. Neither party has provided authority in point, and we can find no Arkansas law touching upon this particular matter. Our research reveals that the resolution of this issue depends upon an interpretation of the coordination of benefits clauses as stated in the respective contracts.

Coordination of benefits is a valid method to contain health care costs within reasonable limits by the prevention of duplication of payments in excess of actual medical charges. *Blue Cross & Blue Shield of Mississippi, Inc.* v. *Larson*, 485 So. 2d 1071 (Miss. 1986). As observed by one court:

> In modern American society, husbands and wives frequently both work outside the home with each being covered by his or her own employee health care group plan. Family coverage, in such circumstances, sets up the potential for duplication of benefits where one or both has family coverage under a plan. Duplication of benefits accomplishes none of the goals of such plans, serving only to run up the cost of the plans. Hassles, such as the one before us, increase the costs of administration of the plans and can delay payment of the medical bills (or reimbursement to the employees who have previously paid the bills).

*Blue Cross & Blue Shield of Kansas, Inc.* v. *Riverside Hospital*, 237 Kan. 829, 703 P.2d 1384, 1388-89 (1985). In order to avoid duplicate recovery by beneficiaries who are covered for the same benefits by multiple plans, the health insurance industry has

developed a double-recovery prevention technique called the coordination of benefits provision. *Starks* v. *Hospital Service Plan of N.J., Inc.*, 182 N.J. Super. 342, 440 A.2d 1353 (1981). As noted by the court in *American Family Life Assurance Co.* v. *Blue Cross & Blue Shield of Florida*, 346 F. Supp. 267, 268-269, (S.D. Fla. 1972), *aff'd* 486 F.2d 225 (5th Cir. 1973), *cert. den.* 416 U.S. 905 (1974):

> COB has as its primary characteristic a structure of priority of claim payments which enables broad risk accident and health insurance carriers to reduce the amount of premiums paid out by limiting the claimants to a single payment of benefits for a single medical risk. If two or more policies would result in payment of more than 100% of the expenses then, coordination of benefits is applied.

*Id.* COB is not, of course, the only industry approach to the duplicate coverage problem. Contracts covering all types of risks customarily contain some provision specifying or modifying the carrier's responsibility to its insured in the event that the risk insured against is covered by other insurance as well. *Starks* v. *Hospital Service Plan of N.J., Inc.*, *supra*. These "other insurance" clauses generally fall into three categories: (1) *pro rata* clauses; (2) excess clauses; and (3) escape clauses. *William C. Brown Co.* v. *General American Life Insurance Co.*, 450 N.W.2d 867 (Iowa 1990). COB provisions are a fourth category. *Id.*

Typically, COB provisions prescribe rules to determine when the carrier's obligation to pay is primary or secondary. Primary means the carrier pays all medical expenses that qualify for payment under the policy or plan. Secondary means the carrier's obligation is excess to all other insurance covering the insured. *Id.*; *see also Starks* v. *Hospital Service Plan of N.J., Inc.*, *supra*. The common approach in reconciling such clauses and determining the order of priority is stated as follows:

> In dealing with such problems, the judicial task is first to determine from the contracts themselves what obligations the respective obligors intended to assume and then to determine whether these intentions are compatible not only with the other but also with the insured's rights and expectations and with the controlling demands of public

policy.

*Starks* v. *Hospital Service Plan of N.J., Inc.*, 182 N.J. Super. at 351, 440 A.2d at 1358. *See also Northeast Department ILGWU Health and Welfare Fund* v. *Teamsters Local Union No.229 Welfare Fund*, 764 F.2d 147 (3rd Cir. 1985); *Blue Cross & Blue Shield of Mississippi, Inc.* v. *Larson, supra; Blue Cross & Blue Shield of Kansas, Inc.* v. *Riverside Hospital, supra.*

 Applying this principle to the case at bar, Blue Cross clearly has undertaken a primary obligation with respect to this claim by stating in its COB clause that "[t]he subscriber's contract or policy will be considered primary." The clause in the Trust's policy provides:

> The benefits payable under the Plan for covered charges incurred will be coordinated with any group insurance and automobile insurance medical benefits from all of the following plans: 1) This plan, 2) any other group, blanket, or francise insurance coverage excluding any student school accident insurance coverage, 3) group practice and other group repayment coverage, 4) group service plans, 5) any coverage under labor management trustee plans, union welfare plans or employer organization plans, and 6) any coverage provided under governmental programs, and any coverage required or provided by statute, including any medical benefits required under automobile insurance policies. This coverage will not otherwise coordinate against your individual medical policies.

> The Trust may obtain or release any information necessary to carry out these provisions. You must declare your coverage under other plans. To expedite payment of claims that involve Coordination of Benefits, the Trust will make a appropriate full or partial payment within a reasonable period of time. This period of time will not exceed 90 days after receipt of complete claim forms that contain the information necessary to make a determination of the benefits that would be payable in the absence of this Coordination of Benefits provision. The Trust can recover from the insured amounts which are overpaid to him.

Noticeably absent from this provision is any overt expression of

the circumstances which will render its obligation primary and those which will render it secondary, as is characteristic of a COB clause. In its silence on this matter, which is the essence of these types of clauses, we detect an ambiguity in the order of benefits payable under its terms. As stated by the court in *Time Insurance Co. v. Sams*, 692 F. Supp. 663 (N.D. Miss. 1988):

> Because a coordination of benefits provision inures to the benefit of the insurer, the insurer usually drafts this clause of the contract. To assure that it obtains the desired result, however, the insurer must be careful in drafting its coordination of benefits provision because ambiguities in any clause of the insurance contract will be construed against the drafter.

*Id.* at 667. Keeping in mind that the insured here is the direct beneficiary of the Trust's policy, in which it agreed to cover the insured's loss within the limits of its liability, and absent any indication to the contrary, we hold that the Trust is also obligated as a primary insurer under its COB clause.

Having so determined that each insurer is primarily obligated, the question becomes what is the extent of their respective liabilities. In this regard, courts have found applicable and have resorted to the use of the general principles arising from "other insurance" litigation. *See Starks v. Hospital Service Plan of N.J., Inc., supra.*

In *Carriers Insurance Co. v. American Policyholders' Insurance Co.*, 404 A.2d 216 (Me. 1979), the court was confronted with competing "excess" clauses in the insurance contracts. The court found that both policies were to be considered primary. In apportioning liability, the court adopted what it called the minority approach, but which it said was finding acceptance in a growing number of courts. This method requires each company to contribute equally until the limits of the smaller policy are exhausted, with any remaining portion of the loss being paid from the larger policy up to its limits. In so holding, the court remarked "this Solomon-like approach comports with a most basic sense of justice."

We, too, are persuaded that this is a sensible approach, and note that there is some support for this view under Arkansas law.

*See Calvert Fire Insurance Co.* v. *Francis*, 259 Ark. 291, 532 S.W.2d 429 (1976); *Allstate Insurance Co.,* v. *Equity Mutual Insurance Co.*, 257 Ark. 341, 516 S.W.2d 389 (1974). This was essentially the holding of the court below; therefore we affirm the trial court's findings as to the nature and extent of the liabilities of the insurers in this case.

■ We do, however, agree with the Trust that the trial court erred in assessing a penalty and attorney's fees against it. Arkansas Code Annotated § 23-79-208(a) (1987) provides:

> In all cases where loss occurs and the cargo, fire, marine, casualty, fidelity, surety, cyclone, tornado, life, health, accident, medical, hospital, or surgical benefit insurance company and fraternal benefit society or farmers' mutual aid association liable therefor shall fail to pay the losses within the time specified in the policy, after demand made therefor, the person, firm, corporation, or association shall be liable to pay the holder of the policy or his assigns, in addition to the amount of the loss, twelve percent (12%) damages upon the amount of the loss, together with all reasonable attorneys' fees for the prosecution and collection of the loss.

However, pursuant to Ark. Code Ann. § 23-61-502(3) (1987), the health care plan of the Trust is specifically afforded an exemption from the provisions of the Insurance Code. Based on this exemption, the trial court erred by imposing the statutory penalty and attorney's fees, and we reverse on this point.

Affirmed in Part, Reversed in Part.

CRACRAFT, C.J., and JENNINGS, J., agree.